Mr. Wade, representing Kristi Dearman, we'll hear from you first. Take your time, take your time. Take your time. May it please the Court, Your Honor. I do apologize, Your Honor. I woke up with what seems to be a cold this morning. All right. Bring your water to the podium, Your Honor. Thank you. Your Honors, we're here today following the district court's grant of the defendant's motion for summary judgment and the dismissal of Ms. Dearman's claims made pursuant to the First and Fourteenth Amendments. The district court declined to exercise any supplemental jurisdiction over state law claims. Now, Ms. Dearman originally brought this suit in the spring of 2013 after she was initially terminated in the non-renewed by the school district. Prior to that, Ms. Dearman had supported, who turned out to be the losing candidate in the superintendent's race in the Stone County School District. During that election, Ms. Dearman was a vocal supporter and an open supporter of Mr. Nightingale. And, in fact, at some point during the election, her school principal came to her and others and told them that her supporter, Jim Nightingale, in the election could have repercussions if he were to lose. Now, ultimately, Mr. Nightingale did lose that election. And shortly after the superintendent, Dr. Gwen Miller, took office— I can understand that this statement that there could be repercussions from the election was made to a group of supporters for Nightingale. Was it made just to the general classroom or was it made to specific people that were supporting? It was made to a few specific supporters, one of which being Ms. Dearman and another being, which we don't really talk about in our brief, but it's in the record of Ms. McCarty, who was also spoken to by Mr. Gavin, the principal, about having these signs in their yards. And he didn't say that he saw them himself. He said he was told that they had the signs. And he came to them and told them there could be repercussions because of them. I see. Well, I mean, I think that strengthens your case as far as from the knowledge point of view, maybe a little bit, because that's what I was kind of hung up on. She asked, do you have any actual knowledge that he knew? And she said, no, I have no knowledge that he knew of my support of his opponent. But now if a member—who is this person that came to him and— The principal of the school. The principal of the school came to him and singled him out as supporters of his opposition. I mean, that seems to support knowledge a little more strongly than I detected from your briefs. And to your question on knowledge, we'd also like to point out that—we pointed out there were five Nightingale supporters. The five core supporters who openly supported Nightingale during the election were all transferred and separated from the middle school after Mr. Nightingale lost. And no others were. Well, there's nothing to reckon about. We know that it hadn't been argued by the other side. There may have been or may not. I can't tell you that today because it wasn't something— But they have not come forward and said they were not singled out because there were a lot of others. They've not said that. Correct, Your Honor. That wasn't addressed. In fact, Ms. Dearman testified in her deposition, which is part of the record, that it was—sure, people got transferred, but very rarely were they transferred without their request or being voluntary. And it's even more rare for five people, a group, who all had the same connection to be transferred at the same time. All right. Now, with respect to the transfer, was there any evidence that the transfer was for less money, more onerous conditions, or in any way a form of punishment? Your Honor, we're not arguing that that was an adverse action. What we're arguing is it goes to show the intent and knowledge on the part of the school district because it's— In other words, why would he have transferred them if it were not to punish? And if it were to punish, there would have to be some adverse consequences to the transfer. That's kind of the argument that we're making is that—I don't know if punishment's the right word as much as it is to split up the Nightingale supporters. And it all goes back to the knowledge. There's no other reason—and this is something that a jury, a reasonable inference has made. If you have a group of friends, for example, in a classroom, they all talk together, you split them up. Your reason is to split them up so they can't get together, can't talk about things, can't support each other. And there's no reason that they should be moved otherwise. Okay. So that's—is that clear from the record in the argument you made below that that was the motive behind them is to split up this opposition to him? We just aren't arguing whether it was done to split them up, to get Nightingale supporters apart from each other. Okay. And also on that, Your Honor, of those five, three within the year were terminated, were forced out. And two, I'm just not aware of what happened to them to this day. I don't know. But three of the five, Ms. Dierman, Mr. Nightingale, and Debbie Lane, no longer work for the district. And the testimony was that Ms. Lane was forced out of the district. And so that also, Your Honor, we believe goes to show knowledge and intent. Because if we go back and look at Mooney, which was a case that Your Honor authored, Mooney was a three-year time period which was removed from the election to the termination. But when you look at all the facts in a vacuum, temporal proximity alone may be insufficient. But the facts of the case, that Ms. Dierman openly campaigned for Mr. Nightingale, that Principal Gavin told Ms. Dierman that he had been informed that she was supporting Nightingale and that it wasn't a good idea to have a sign in her yard, that then just a few months after Dr. Miller took office, the Nightingale supporters who were all in the same school were all separated out. Okay. Let's assume that you have knowledge and then come to her actual termination and discharge. Yes, Your Honor. For misusing her former privileges, I suppose, of accessing these records of the disabled children. Now, on the basis of the briefs, it sounded like that was a far-caused discharge. Well, Your Honor, for one thing, the district court didn't really address anything under McDonnell Douglas or any sort of burden shifting. It pretty much stopped at the very beginning and said, well, there's no causation. So, it really didn't examine anything else. So, we haven't really argued that. However, as just for a disparate treatment argument that would be made, which we do address in our brief, the special education director, Wendy Rogers, just gave her password and username to several individuals, at least three that we know of, and nothing adverse has ever been done to her for doing that. But this person you're speaking of, comparing her, she didn't have access to the records either. Ms. Rogers, Your Honor? Ms. Rogers. No, Your Honor, Ms. Rogers was a special education director, so she had access to everything. What she did was she gave her access to others, her username and password, which is one of the faults that the school district tries to put on Ms. Dearman was the fact that she used Jim Nightingale's username and password to access these records. And there's no explanation for the disparate treatment there. Ms. Rogers admits that she's done that, that she's given access to people, and there's nothing adverse being done to her for doing the exact same thing. So it's your position that this is pretext because the other people weren't punished this way, but you had some other argument about FERPA not being violated, but I'm not sure that one works, because it doesn't really matter if FERPA was violated, it just has to be that they thought at the time contemporaneously that it was a FERPA issue. Correct, Your Honor. And, in fact, in depositions that were taken in this case, the school board actually admitted that, well, whatever the superintendent tells me, I'm going to assume she's right if she says it. I mean, there's no independent investigation, they just rubber stamp whatever she tells them. And under FERPA, for one thing, FERPA deals entirely with the disclosure of records. Ms. Dearman disclosed nothing. All Ms. Dearman did was make a few, I don't know if they're grammatical checks, but she just made sure that the re-evaluations were done properly. These students were people that Ms. Dearman had previously, as the LSC, which was the local survey chair for the special education department there, she had done the prior re-evaluations on these students. She was simply helping Mr. Nightingale, who didn't know what he was doing, and he admitted to not knowing what he was doing, and he asked the defendants for help in what he was doing. They told him, go get help. He went and got help. But it doesn't matter whether it violates FERPA or not, as long as the people making the decision to not renew her are deciding that it's based upon a FERPA situation. As long as they're not knowingly not relying on FERPA and just pretending. If they have a good faith belief that what they're being told is true, and they fire based upon that or not renew based upon that, that's not actionable, is it? Well, that's one reason we also point to, this is not a but-for type causation. This is a motivating factor. The question isn't whether or not she could be fired for violating FERPA. The question was whether or not she would have been violated for FERPA. And again, that was something that really wasn't addressed by the district court, and it's not something that we argued here specifically. We touch on it for due course. But under McDonnell Douglas, we never got to the pretext argument, which again, the Nightingale's the person she helped. Your Honor, if she had helped Joe Smough down the street, argument probably completely different, but it all comes back to Nightingale and her support of Nightingale, her helping Nightingale. And that's where we believe, Your Honor, this pretext is kind of a jury question. It should have gone to a jury. One of my favorite quotes, and I probably put it in every brief, is Justice Rehnquist, where he goes back, and I cannot recall the name of the person that he cites to, but Lord, somebody from England. But it's all about the contents of a man's stomach. You don't know what it is, but it's inference. It's a jury question. And we've submitted enough evidence for a jury to make this call, not the court, on this issue. Are you suing at this point on the suspension? Yeah, the suspension and the termination go together. It is true that Ms. Dearman did not specifically request a hearing on her suspension. She requested a hearing on her termination that she was never given. The suspension was based on the termination. But she was never terminated. Correct, Your Honor. So it seems like those two go away and you're only left with failure to renew. So explain to me why that's not accurate. Well, we go back to one of the things that the district has complained of is that Ms. Dearman didn't follow the law to a T, which is disputed. But in the same token, the district hasn't followed the law because the law requires the district to provide . . . A, they never provided a hearing after the request was made. They have a timeline that they were supposed to provide a hearing. That was not followed. Then Ms. Dearman did address the board at some point. However, following that hearing, whether or not it was an actual hearing or not, they never gave her a final determination, which was under the law. They were supposed to do it a certain time frame. Are you talking about with regard to the termination only or the suspension or the non-renewal? I'm talking about the non-renewal now, Your Honor. The non-renewal, what the district did here was, and is testified to by multiple people within the district, was the non-renewal was easier, as they put it, because it didn't have the same, as they argue, the same requirements as a termination. Now, under Mississippi . . . Do you have a property interest subject to due process protection in the renewal of her contract with the school district under Mississippi law? Yes, Your Honor, because there are restrictions per Mississippi law placed on when you can non-renew a teacher. Now, I will admit they're not as restrictive as a tenured professor. A tenured professor is extremely restrictive malfeasance and gross misconduct for a tenured professor. However, under Mississippi law, it is not a should, it is not a may, it is not a could. It is, it requires the board to have a valid educational reason for the non-renewal. It is restrictive. And then we can look at Pruitt, which, although Pruitt was affirmed by this court, it didn't actually write its own opinion, but to borrow from Pruitt, the court held that if the contract was restrictive, it would have been a different case, because the contracted issue in Pruitt did not have restrictions on non-renewal and things of that nature. So, therefore, because Mississippi law has a restriction, it may not be a extremely restrictive restriction, but it's a restriction nonetheless, and a teacher is guaranteed a non-renewal if they're not notified prior to a certain date that they're not going to be non-renewed. So, there are multiple levels to this entitlement to continued employment with the district. And also, if we look at Perry v. Sinderman, which is a case that was decided at the same time as the Roth case, in fact, the same day, I believe, were the orders, the opinions were issued about the same time, the court said that you look at the facts of the case, not just necessarily the strict rules, because in Perry v. Sinderman, 408 U.S. 593, there was no tenure program in place in there, but the court looked at the facts of the case, the fact that he had been a longstanding employee. Ms. Dierman, for 11 years, all she had to do was say, I want to work there next year, or they offered her a renewed contract. She didn't have to do anything special to get it. It was brought to her. And each year, for 11 years, she has continued employment with the school district, so long as she doesn't violate the rules, so long as she doesn't break the law. And, Your Honor, that's why— They're saying, though, that she did violate the rules. You're right, Your Honor. We've never got to address that, because she never had a hearing on the matter. And that's where we get— I mean, that's what they charged her with. Yes, that's correct, Your Honor. They charged her with violating, and as I understand, she's not disputing that she did what she was charged with. She has said there were extenuating circumstances. It should not result in discharge. That's correct, Your Honor, and that's why there's a—the due process requires a hearing, just like someone who's charged in a criminal matter. You get a hearing before you go to jail, and that's what she's doing now. Did she ever get a hearing on her termination? She had no hearings whatsoever, Your Honor. Did she have an opportunity for a hearing on her determination of her contract? For the termination, no, Your Honor. She was never given a hearing. She showed up one day to address the board before she was given the reasons for anything, but she was never given a hearing. Now— Did they give her an opportunity for a hearing on her termination of her contract? Well, no, Your Honor, because the termination and non-renewal are different. I mean, non-renewal. On the non-renewal, she had a hearing scheduled. Now, the defendants argued that they never received her responses to the non-renewal. When that was brought to our attention, Your Honor, we said, well, if you didn't receive them, we'll resend them. Your Honor, we—the responses were sent. It was also—there was a holiday in between, and it was also after school had already let out, so I can't explain why the district may not have gotten it before the five days. They admitted that they got them, but did not receive them timely? Well, no, Your Honor, they said that they've never received them. Your Honor, we presented what was sent by affidavit that it was sent. We presented copies of the letters that were sent, and all we requested was, fine, just move it out, and we'll resend it. Now, when did they tell you? I believe it was the two days before the hearing or maybe the day of. When did they tell you they had not received it? One to two days prior to the hearing, Your Honor. All right, and did you then furnish it to them? Well, Your Honor, we said, well, we're going to resend them. Can we redo it? They sent back and said, no, it's off. Don't worry about it. They said what? They said the hearing's canceled. It's not going to be rescheduled, and we began an argument over whether or not it should be rescheduled. They weren't going to take the documents they hadn't received? No, Your Honor. They wouldn't let us do anything. We were actually dealing with a— Save some time for rebuttal, Mr. Wade. We'll hear from you, Ms. Fitts. I mean, is that true that the only reason that she was denied a termination hearing is that the documents were not filed timely, and even though they were offered after the time period for receiving them had expired, you refused to accept them? Your Honor, yes, that is true. That doesn't sound very reasonable to me. Well, the district had no authority to extend the time to provide that information. Well, he gave you an affidavit. He says he gave you an affidavit that he had actually mailed them, and then he says, two days before the hearing, and he said, so, I mean, you had to accept his affidavit. There was no contrary evidence of that. He gave you the documents, and then on that technicality, you denied her a hearing and terminated it. That doesn't sound—that sounds like you have some explaining to do. Yes, well, the law does provide, under the statute, under the Education Employment Procedures Law, it provides strict timelines, both for the district and for the employee. The district was required to provide a date for the hearing, which it did, June 4, 2013. The district then was required to provide the employee 14 days before that hearing with a list of its witnesses, a list of the charges against the employee, and the documentary evidence that the district intended to present at the hearing. If the district failed to do that, then the contract would be renewed. There would be no hearing. The contract would have to be renewed. So the district had the same requirements, the same strict requirements of the statute, and had no authority to extend those deadlines, according to the attorney general's opinion that we cited in our brief, the Dickerson opinion, and according to the McDonald v. East Jasper County School District case, in which those dealt with the notice provisions. Did you have—did any of those cases say that this is an absolute rule with no exceptions, notwithstanding the fact that it may have been lost in the mail? Those cases do hold that the district had no authority to extend those timelines, those deadlines. So the district could not do anything other than abide by the timelines. They had to abide by them, and they had to require that the employee abide by them as well. Do those cases hold that that's the case, even where the person says they did provide the information, or any of those cases dealing with where the information was allegedly sent, and there's an argument that it was lost on your side? Well, our argument—well, we don't necessarily say that it was lost. It was actually never received by the district. Okay, or never received. In this case, Dr. Gwen Miller was expecting to receive it. She made certain that she checked the mail in the presence of another individual each day that it came in to see if it was received. It was never received until after the complaint was filed in this action. My question was, do any of those cases deal with the situation where the person says they sent the information? They don't deal with that part of it. That's correct, Your Honor. They don't deal with that. But the fact of the matter remains that if one is under—especially in this day and time where we have email, we have fax, but there are multiple ways to make sure something is delivered. We could get a transmission acknowledgment from a facsimile. We could get an email and ask for an acknowledgment that it was received. All those ways we could prove that we had actually sent something when it was supposed to be sent and that it was received by the recipient. It's not something that's difficult to prove. All we have here is an affidavit. Right. Why doesn't that affidavit create a fact issue on whether or not it was sent? Why isn't that a fact issue? Well, actually, an affidavit is not confident summary judgment evidence. It is the testimony or the sworn testimony of the counsel for the appellant in this case, but it's not summary judgment evidence. It's not sufficient to create an issue of fact. Why not? It's just there's nothing to corroborate it. Why do you need corroboration of a sworn affidavit that the document was sent? What evidentiary rule says that that is not evidence, a sworn affidavit? Well, I don't know that I can cite you to that particularly. Pardon? It may not be conclusive, and you can certainly challenge the affidavit, but, I mean, without anything countering that affidavit, it is evidence. Well, Your Honor, an affidavit is not admissible in court. It doesn't have the same standing as testimony where it's subject to cross-examination. It doesn't have the same standing. It's admissible on summary judgment, and that's the type of standard that we're dealing with here. An affidavit is admissible. You can make objections to it, but that's not accurate that an affidavit is not admissible. I'll tell you what. We kind of hit you with a bunch of questions coming out. You've got an argument to make. Go ahead and make your argument. But it was not a response. The affidavit was not a response. No, the affidavit was just counsel's affidavit to indicate that he mailed the response on May the 28th and it was drafted May the 27th. He did not send the information that was requested at the time of his affidavit? No, Your Honor. My understanding from the district is that that was not received until it was attached to the, I think, to the amended complaint filed in this action, which was, I think, in April of 2013. Okay. Well, I'm learning stuff here. You're saying that counsel submitted an affidavit two days before the hearing to say, when's the first time you saw the affidavit? The affidavit was submitted in response to the motion for summary judgment. All right. And then did you ever receive the evidence from him? That's the response we're looking for. Not what he said, but did he give a response to what the charges were? There was a letter dated May 27, 2013, that was attached as an exhibit to the amended complaint, and that was when the district received that information. It was a letter, I think, indicating similar to what Mr. Wade has argued, is that regarding the disclosure, he simply said that she did not violate FERPA and IDEA. If you had received the letter dated 5-27-13, that would have been a timely response that would have triggered the hearing properly, right? If it had been received by, I believe the date it had to be received was, I'm not certain if it was May the 31st or June the 1st. I think it had to be more than five days before 6-4-13, right? That's correct. Okay. I guess that would be May. If you had received it, it would have been the proper document, right? That's correct. And the hearing would have taken place. Okay. Well, I still don't understand the facts because I don't understand the facts from the briefs. I don't understand what you're saying exactly. It's what Judge Reveley said. When did you first receive the required response that the rules require him to submit to you before the hearing? When did you first get that? That was received with the amended complaint. After this litigation started? Yes, sir. Now, when did he first understand or when did the plaintiff first understand that you had not received that information? It's my understanding that he was aware of that fact June the 3rd, 2013, which was the day before the hearing was scheduled to take place. So he knew that you had not received his information, but he still did not furnish it even then? That's my understanding, Your Honor. But he offered to furnish it then, and you all said you don't bother. Isn't that right? Well, from what I understand, I was not participating in those emails, but it's my understanding that he asked for a continuance to present that information, and he was advised that they could not extend that deadline. Well, he didn't just ask for a continuance. He said, I already sent it, and I can give it to you again, right? That's what he said to us just a second ago. Those emails are, I think, in the record. I have not read those. I don't recall exactly whether they said he had sent them. My understanding is he did ask for an extension of time to send them. I don't know that he may have said that in the emails between he and Sean Courtney, the district's attorney, but it is significant that he emailed Sean Courtney on June the 3rd. This is all getting too confusing for us to settle out here now, so go ahead and make your argument. I would say that that is in the record. Those emails, I believe, are a part of the record in this case. There are some things that I would like to point out that Mr. Wade mentioned in his argument that I don't think are accurate. First of all, I think there's a little misunderstanding about the conversation between Mike Gabb and the principal of Stone Middle School, where Ms. Dearman was a teacher. In 2011, this campaign involved six candidates for superintendent, none of whom were the incumbent. The incumbent did not choose to run for reelection. These six individuals were all employees of the district. The principal, Mike Gabbin, was principal at Stone Middle School. He left the district's employment in the fall of 2011 before the election took place. The principal was not a decision maker in any activity that related to the adverse employment action that took place with Ms. Dearman's contract. He had nothing to do with any decisions made regarding her, the ultimate decisions that were made regarding her employment. There's absolutely no evidence that Mr. Gabbin said anything to Dr. Gwen Miller, who was the decision maker, regarding Ms. Dearman's support for Nightingale. There's no evidence in the record whatsoever that Dr. Miller had any information that Ms. Dearman supported Jim Nightingale in this election. And as I mentioned, there were six candidates. Dr. Miller had no way to know who supported who, what employees within the district supported what candidates. Ultimately, there were three who were actually in the final campaign. One was an independent, one was Mr. Nightingale, and one was Dr. Miller. Dr. Miller was the winning candidate, and she took office in January of 2012. The fact that there were supporters who were transferred, those were allegations that were made by Ms. Dearman. There's not any evidence to suggest that Dr. Miller knew that these people supported Jim Nightingale. There were reasons for the—we don't know the reasons for their transfers. That's not in the record at all. But we do know the reasons for the transfer of Ms. Dearman and the reasons for the transfer of Mr. Nightingale. Mr. Nightingale was a special education teacher. The students that he taught ranged in age. They weren't just middle school age students. Some of them were up to 18 years of age. So it was decided not by Dr. Miller but by Wendy Rogers, the district's special education director, to move Mr. Nightingale's class that involved those students of different ages, including some who were high school age, to the high school campus. And that was why he was moved. And that decision was made by Wendy Rogers, not Dr. Miller. Dr. Miller did decide to move Christy Dearman from her position as a Stone Middle School counselor because of a retirement of one of the elementary school counselors. There was a vacancy then in one of the elementary schools. The elementary schools only had one counselor. And up until the time Ms. Dearman became a counselor, there was only one counselor at the middle school as well. And Ms. Dearman had only been a counselor for two years. Why isn't there a fact issue on this? Because there are a number of people who supported Nightingale that were transferred. And there's also a statement that the principal had made this comment, even without direct evidence that the principal was making it at the behest of his friends, Miller or whatever. Why isn't that some circumstantial evidence that it could be because of the relationship? Why isn't that circumstantial evidence for which you have a fact issue? And then you can say, well, no, it was Ms. Rogers and there was a special ed need. Why isn't there a fact issue? Well, there's no facts to support the contrary issue. Well, the facts is the circumstantial evidence of the five people who were all Nightingale supporters that were either transferred or terminated. I don't know if there's any evidence that anybody was terminated. I believe one was allegedly to have resigned. Transferred. There were several who were transferred. And one forced out. Pardon? That's what I understand, that five core supporters, yes, there's allegations that five core supporters were transferred and then three ultimately terminated and one forced out. That's what we just heard. I don't know if that was in Mr. Wade's brief. I don't recall that being in the record. There's some argument, though, that the record has that information in there, that five people were transferred out who were supporters. Is that some circumstantial evidence that creates a fact issue? If not, why not? I don't believe it does, Your Honor, because there's still no evidence to indicate that these transfers of any kind were, first of all, whether they were detrimental or whether they were an adverse employment action. In fact, Christy Dierman has testified that she enjoyed her work at the elementary school where she was transferred. I don't think they have to be tangible detrimental employment actions because they're not suing on the transfers. They're saying the transfers provide knowledge, that the decision makers had knowledge. No, it would have to be animus. In other words, there would have to be animus involved in it, and to have animus there would have to be some adversity to that particular transfer. Well, that plus the fact that it's not evidence of discrimination. But that's not where the discrimination occurred. It's whether or not the miller knew that these people were all Nightingale supporters. Yes, sir. There's absolutely no proof that she knew they were Nightingale supporters. That is the— Well, is that some proof that she knew if all these people are transferred? I think there has to be more evidence than that because, like I said, these transfers were not necessarily a demotion or anything that was an adverse action. Were these people ultimately terminated? To my knowledge, they were not. I think one did leave the employment of the district of her own accord, but from what I recall of the record, they were not terminated. Do you— And there's definitely no proof that Dr. Miller knew who— In fact, she had previously worked in the district. She knew Christy Dierman. She had reason to believe Christy Dierman would have supported her in the campaign as well as Nightingale. They all knew each other. They didn't try to find out who was supporting who, and she absolutely had no knowledge who supported who. In this election, as I said, there were six candidates. They were very busy trying to get out the vote. She didn't have time to determine who was supporting who, and she did not know. There's not any evidence from any aspect that she knew who supported Jim Nightingale. Okay. Let's talk about the termination and suspension. Those would seem to be good parts of the case for you, wouldn't they, that there's no evidence that a hearing was ever requested on the suspension? Is that right? That's correct. I think that's admitted that there was no— There can be no claim on that, can there? I don't believe there can. I think that is a completely moot aspect of the case, Your Honor, because the board never took any action on the termination, and she was suspended. She could have taken action herself on that if she had felt the need to. She could have gone to Chancery Court to ask for some kind of ruling on that, but the fact remains she was being paid. Her contract was paid. She got all her money during that time. Yes, Your Honor, she did. She was paid completely throughout the school year. And the termination never took place? That's correct. Okay. What was the reason for non-renewal? The reasons for non-renewal were the fact that the— and this is important to understand that what actually happened was Wendy Rogers, the district's special education director, had gone to the elementary school, and she just happened to see a high school student's special education folder, a confidential student's folder, on Christy Dierman's desk. Christy Dierman was not there. The room was not locked, and the folder was just on the desk. The requirements for the special education folders, the student folders, were that they be locked in their teachers' classrooms. This is where they remained all the time, except there's some testimony during testing. For some reason, these folders were all then taken and locked in the administration office of the school while in testing. But otherwise, the folders were not to be removed. They're not to be taken from home by the teacher. They're not to go anywhere but stay in that classroom and remain locked in that classroom. Also, the district under FERPA and IDEA was required to determine who had access to those students' records. This was the basis of federal funding, and Dr. Miller had previously been the federal funding director for the school district, so she was well familiar with what was required of the district in order to maintain their federal funding. But anyway, when Ms. Rogers found that file there, she told Dr. Miller about it, and Dr. Miller felt it was important that they determine why Ms. Dierman, who had no access, who was not authorized to access this information any longer and had not been authorized to access this information from the time she became a counselor. When she was a special education teacher, she did have authority to access her own students' information. He says this happened with respect to other people and nothing was done to them. What do you say about that? Well, that's a completely different situation, and what he's referring to is the director of special education, Wendy Rogers, did apparently give her access code to Christy Dierman to go into the system, but that was when Christy Dierman did have access. She did have authority, and she was on the list. She was a special education teacher at that time, so she did have a reason to access those records. She was on the list of those persons authorized to access those records when Wendy Rogers gave her that login and access ID. It's a completely different situation at that time, and at times if others shared that was the only testimony that was given was that was shared between persons who did have authority to access those records. You have a red light, and there's so many facts in this case. I don't think we're going to resolve any of them here, so we'll hear from Mr. Wade. Can I ask a legal question? Can we decide the case on the basis that there is no due process right to a hearing in the non-renewal? That's what the district court did as an alternative basis, and then we don't deal with any of these facts. Is that accurate under Mississippi law that there's no due process right to a hearing for a non-renewal? That's what the district court said. Well, I didn't understand that that was what the district court said. What I understood is that there is a right for due process. It was just simply not exercised by the plaintiff. The fact is that the reason that the hearing did not take place that was offered to the plaintiff was because of a failure to provide the district with that information within the time limits. Do you believe there's a due process right to a hearing under Mississippi law? I believe there is, Your Honor. Okay, thank you. Okay, thank you. Ms. Manson-Swade, you saved some time for rebuttal. Thank you, Your Honors. To begin with, since we've talked about these e-mails real quick, I didn't want to touch on them. They are in the record on page 1057, in which we did contact after receiving notice that they didn't receive them. We requested the school board be asked to move the hearing since we put in quotation marks, you didn't receive the response, and we'll resend the responses. We also pointed out the school board already received responses to Ms. Dierman's initial termination, which was on the exact same issues, and the school district said no, and that unless they hear otherwise, they would consider the matter resolved at that point. So, we were never given a further opportunity. Now, one thing in regards to the hearings, and we didn't, in regards to whether or not there was a hearing, one aspect of this case, Your Honor, is, which Your Honors are actually having an opinion on, is Rosenstein dealing with the liberty interest that could stem from this matter and not having a hearing on the matter. In fact, Your Honors wrote a dissenting opinion and a majority opinion in that case dealing with the liberty interest. Now, these are very stigmatizing charges for a— You didn't brief that to the district court, did you? We didn't brief it on point. We brought up the liberty interest that were in her name, in her reputation, but we did not go into Rosenstein or to what is addressed in Pruitt. We didn't do an in-depth analysis. But you say, we also have a claim for a liberty interest, and that's a separate claim, and we're trying to articulate that also, like a name-clearing hearing. We didn't say it in those words, Your Honor. We touched on it, but it was not argued in depth. We did bring up the fact that she should be entitled to a hearing because of the harm to her reputation is, I believe, what we cited to or brought up in our brief to the district court. But this was—so I'll move on from Rosenstein, but I do believe, Your Honor, we did bring it up. It was argued. It just was not an in-depth argument like we did before, Your Honors. But the district court didn't—he touched on it, Your Honors, when he brought up that there are circumstances where liberty interest could be invoked, but he went no further on the discussion. Now, in regards to—one thing that was brought up was in regards to Ms. Rogers giving her username and password out. Ms. Dearman was doing the exact same thing she did for Ms. Rogers. Ms. Rogers didn't know how to do something. She asked Ms. Dearman to do it for her. There's no testimony from either side in regards to whose students did Ms. Dearman access when she did this for Ms. Rogers. It could have been students that Ms. Dearman had access to. It might not have been. Ms. Rogers never testified that it was students— We're not going to resolve all of these factual things, and we'll have to look at the record ourselves because we have two divergent views about it. Yes, Your Honor. I understand. I've got something else to say. Go ahead. Now, the one thing that was also brought up, and I'll just touch on it briefly because it would be another factual point, was that there were six other candidates. Nightingale was the only vocally outspoken critic of the current administration, which included Dr. Miller, which was one reason that Nightingale also brought suit, and that has been resolved. Now, another thing that has been brought up is that the district said they didn't have any authority to extend deadlines. We weren't asking for any deadlines to be extended. We were just simply asking that if you didn't receive it, we'll rescind it. The cases which were actually cited by defendants and their arguments were in regards to extending the deadline to request a hearing, totally different situation, totally different circumstances. In fact, the district did have the authority to move the hearing. They did it several times with another, and again, Your Honor, I just want to say in light of some of the questions that the transfer, while it may not have been adverse in and of itself, does show knowledge on the part of the district, and for those reasons, we ask that the district's dismissed opinion be reversed and that this matter be remanded back to the district court for a jury trial. Thank you, Mr. White. Call the next case of the day.